025622 and 0356207 and each party will have ten minutes to discuss the Fugitive Disentitlement Doctrine. We'll hear from Columbia first. MR. TASCHMAN. Good morning, Your Honors. With the Court's permission, I would like to reserve approximately three minutes or however much time I have left for rebuttal. MR. RIEFFEL. Keep track of your own time. MR. TASCHMAN. Thank you, Your Honor. MR. RIEFFEL. Thank you. MR. TASCHMAN. Also, MR. RIEFFEL. We didn't get your name. I'm sorry. MR. TASCHMAN. I'm sorry. Henry Taschman on behalf of Columbia Pictures Industries. MR. RIEFFEL. Thank you, Mr. Taschman. And also, I understand from the Court's scheduling order that if Ivanova raises the issue of subject matter jurisdiction, that Columbia will be given additional time to discuss that as well on rebuttal. Columbia Pictures asked this Court to dismiss Ivanova's two appeals based upon his fugitive status from two warrants issued by two district court judges in two closely related actions. The warrants were issued after Ivanova had been held in civil contempt of the Court's orders, after the Court had assessed substantial fines without any success for Ivanova's disobedience of injunctions issued by both courts. Informing the courts, informing this Court... MR. TASCHMAN. And issued a warrant for his arrest. MR. RIEFFEL. Yes. After the fines proved to be unsuccessful, both courts issued warrants for arrest, and Ivanova has not appeared to be arrested, and he is currently a fugitive from justice. Ivanova, prior to the district court issuing those warrants, Ivanova filed two appeals with this Court, asking this Court to stay the contempt findings and thereby preclude the issuance of the warrant. This Court denied both of those requests for his stay. Nonetheless, Ivanova has continued to disobey the injunctions and remains a fugitive. He has thereby helped himself to the very relief, to the very stay, that this Court has denied him. JUSTICE SCALIA. By disobeying the injunction, you mean there's been a failure to comply to turning over the materials from the films and the million-dollar licensing that occurred in Mexico? MR. TASCHMAN. That's correct. That's part of it. JUSTICE SCALIA. What's the rest of it? MR. TASCHMAN. Well, Ivanova was ordered to cease all activities and any benefit from any of the 33 films. He hasn't done that. Ivanova was directed to turn over to the Court the negatives and other film elements for all 33 films. JUSTICE SCALIA. What do you mean by the physical elements of the films? MR. TASCHMAN. By that, Your Honor, I mean the negatives, the prints, the videotapes, the masters. And what's important about that is not only did Judge Wray rule that Columbia owned not only the intellectual property, but that Columbia actually owned these physical elements, because it purchased them decades ago from the production companies. So the Court ordered Ivanova to turn over what was and what is Columbia's property, and Ivanova has contemptuously refused to do that. And this not only thwarts the relief granted by the Court, but it also permits Ivanova at will to disobey the Court's injunction prohibiting him from distributing the pictures anywhere in the world. JUSTICE SCALIA. Let me raise jurisdiction just to put on the table. Suppose, just for the sake of discussion, just suppose the District Court didn't have subject matter jurisdiction over this case. How would that affect the Fugitive Disentitlement Doctrine? MR. TASCHMAN. I will answer that question, but, of course, we believe very strongly that there is subject matter jurisdiction. JUSTICE SCALIA. No, I ask you to assume it. MR. TASCHMAN. Okay. But assuming the Court's hypothetical, first, I have to state that there is no case in point that we could find that addresses this issue. But we believe that, given the nature and the purpose of the Fugitive Disentitlement Doctrine, that the Court has the power to exercise that doctrine without finding subject matter jurisdiction. And the reason for this is, I think, flows from the nature of the doctrine itself. As the Eleventh Circuit has held in the Rodriguez case, the doctrine is an equitable doctrine that relates to the Court's power to administer the docket and to administer proceedings in the court circuit. So when you say it's an equitable doctrine, does that mean we could look past the fact of fugitive status and decide in our discretion whether or not to examine jurisdiction? MR. TASCHMAN. Yes. It is a discretionary doctrine, and even if all the factors for applying the doctrine are present, the Court, in its discretion, could decline to apply the doctrine and then look to jurisdiction and then apply the doctrine or then go forward and decide the cases in the merits. QUESTION. Do you think it would be, given that the relief is discretionary and equitable in nature, do you think it would be equitable to take away appellate rights if there was no jurisdiction to issue the order in the first place? MR. TASCHMAN. Yes, I do, Your Honor. And the reason for this is, for example, under the Court's Circuit Rule 42.1, if a party repeatedly disobeys this Court's orders, the Court has the power to dismiss that appeal. QUESTION. Let me ask you, though, if the district, again, assuming, for sake of argument, that the district court did not have jurisdiction, would we have jurisdiction? MR. TASCHMAN. Yes, because the Court — QUESTION. If we go to the merits, I mean, we always have jurisdiction to examine our own jurisdiction. MR. TASCHMAN. Two points. First of all, we're talking about two appeals, two warrants, and two motions to dismiss under the Fugitive Disentitlement Doctrine. Now, under the first case, Ivanova has claimed that there is no subject matter jurisdiction. The second case, Ivanova is the plaintiff, and Ivanova filed that case alleging jurisdiction both under the Copyright Act and under diversity of jurisdiction. And no one has or can contest jurisdiction. So, at best, the subject matter jurisdiction issue — QUESTION. Are you saying we get subject matter jurisdiction by estoppel? MR. TASCHMAN. No, I'm saying that there is no question that in the second action there is subject matter jurisdiction, and that that issue as a bar — QUESTION. Does that come from putting the wet and greasy rag of estoppel in the plaintiff's mouth? MR. TASCHMAN. No, not at all. QUESTION. It comes because of what you claim is the subject matter of the action? MR. TASCHMAN. Well, it's not what I claim, Your Honor. It's what the — what plaintiff — what Ivanova has alleged in his complaint. Ivanova has alleged in that complaint, which has been dismissed and which is the subject of the second arrest warrant, that he has jurisdiction under the Copyright Act and diversity of citizenship. Columbia agrees. I guess the Court has an independent duty to see if, in fact, there is jurisdiction, but I would submit to the Court that there really is no question that in the second suit there is jurisdiction. CHIEF JUSTICE ROBERTS. Did you want to reserve the balance of your time? MR. TASCHMAN. Yes, thank you very much. CHIEF JUSTICE ROBERTS. Thank you, Mr. Taschman.  MR. TIMOTHY RILEY. Good morning, Your Honor. Timothy Riley on behalf of the Contemplative State. Your Honor, there's a big jurisdiction issue and then there is a sub-jurisdiction issue related to this — the arrest warrant. And I'm going to focus on the sub-jurisdiction issue. Your Honor, I've been waiting three years to talk about the ruling that led to the arrest warrant. Your Honor, the arrest warrant arose from our distribution of four films in Mexico in violation of the Court's ruling that we had no rights in those pictures. The order requiring us to turn over the elements of the films was issued as a sanction also for violating that order. Your Honor, the proceedings related to those eight pictures turned out to be a farce and the Court did not have subject matter jurisdiction, and I'm going to explain why. The films that we distributed were the so-called eight films. Columbia admitted that all of its rights had expired in the eight films. Columbia then claimed that Consonflas had extended those rights while he was on his deathbed at Methodist Hospital in Houston to various points between 1999 and 2000. The contract is at excerpts of Record 143, page 85. It's the key document because that's the document that explains, in Columbia's own argument, when its rights ended. The contract is almost certainly a forgery, but we decided that we would just give Columbia all of the rights up till the end date, and then when their rights ended, we would resume distribution of the films. Your Honor, in June of 2000, we announced our plans to distribute the eight films. By Columbia's own admissions, its rights had expired in those films. Columbia then claimed that before we could distribute those films, that we owed it a right of first refusal. Columbia brought an application for an injunction to the Court. Are we talking about the distribution of only eight films or of 33 films? We have never distributed any except four of the eight films, Your Honor. We have never violated any other aspect of the order. Judge Wray issued the injunction, and he – here's what he reasoned. If the estate respects the purported first refusal right, it will be in a win-win situation. If Columbia matches the Mexican deal that we were putting together, then the estate will have secured an equally beneficial deal from Columbia. If Columbia doesn't match the deal, fine. The estate will have obviated the need to litigate the matter any further. You know, maybe Judge Wray was wrong. But the problem is your guy sends a letter to the judge and says, go to hell. I'm not going to do what you have ordered me to do. And furthermore, I'm not going to return to the United States to answer the injunction. No, Your Honor. We didn't do that at all. We put on our case at trial. They didn't send a letter to the court saying he's not going to surrender on the warrant? Well, this was much later on. Well, that's what I'm talking about now. I mean, what do we do with that? Well, Your Honor, I'm leading up to that. And if you would permit me, the best way to respond is to explain the circumstances leading up to it. Your Honor, Columbia responded to our – we gave them all the terms of the contract. Columbia responded, and they accepted the contract. They still had to prove that they had the right at trial. The only claim that went forward at trial, Your Honor, was Columbia's claim that we owed it a right of first refusal. After trial, Columbia's case collapsed at trial. And it's addressed more at more depth in the briefing. Columbia's case collapsed at trial. The only claim that it asserted was that we owed it a right of first refusal. Columbia asked the Court not to rule on that claim, but to rule instead that we had no rights in the films. Your Honor, we were the defendant. We were responding to Columbia's first refusal claim. We were the only party to the lawsuit. Your Honor, the Court violated Article III of the Constitution by ignoring the case in controversy before it and issuing a gratuitous judgment against us. Your Honor, the judgment destroyed everyone's rights in the films. We can't distribute the films. Columbia can't distribute the films. The only people who benefited from the ruling are all of the pirates out there, Your Honor, who are distributing the films. Your Honor, I contend and I ask the Court to rule that this was a judgment that was in violation of Article III of the Constitution, clear, clear violation. We were the defendant in the lawsuit answering a first refusal right claim. Columbia asked the Court not to rule on that claim. Mr. Riley, you're trying to respond to the motion to dismiss under the fugitive disentitlement doctrine has more than half expired, and you haven't addressed the motion yet. You would probably want to tell us why we shouldn't dismiss, why your client is not a fugitive. I haven't heard anything about that yet. Your Honor, if the Court was acting without jurisdiction with respect to these eight films, I believe that we had the right to distribute the films in Mexico where we are the Mexican copyright holder, and we did violate that order. We did that after an assessment that the Court clearly acted in violation of Article III of the Constitution just with respect to those eight pictures. Because it lacked jurisdiction, subject matter jurisdiction? It lacked subject matter jurisdiction of the whole matter, Your Honor. Subject matter jurisdiction under the stipulated judgment was wrong, I believe. Subject matter jurisdiction as an interpleader was also a farce, I believe. But when you get down to these eight particular films, the Court went further. He let Columbia abandon the only claims that Columbia, the plaintiff, made, and he ruled against us. Your Honor, it's my assessment that under the law, that if the Court was acting without jurisdiction, we could distribute those films in Mexico. Your Honor, and we carefully selected films that Columbia had given up its rights  Columbia had no rights to these films. We also chose Mexico because that's where we own the copyright, and we were engaging in protected activity in Mexico. We also selected DV distribution because Columbia had never, ever acquired DVD distribution. The problem is not that the order was disobeyed. With the Fugitive Disentitlement Doctrine, the problem is that your guy is outside the jurisdiction of the Court and says he's not coming back. And so he's got a heads-I-win, tails-you-lose sort of position here. If he wins the appeal, great. If not, he's on the lam. He's not surrendering to the Court. Your Honor, he's – number one, Your Honor, if the Court was acting without jurisdiction, the fact that he's a fugitive has to be wiped off. The Court first has to reach the jurisdiction issue. And if the Court was acting without jurisdiction, the man's not a fugitive. You're talking about the original order. Pardon me? You're talking about issuing the original injunction as to the four films. Right. Okay, so why, in your view, did the Court lack jurisdiction? Pardon me? Why, in your view, did the Court lack jurisdiction to issue the original injunction? The injunction on the eight pictures was issued against us and on behalf of nobody, and it was in violation of Article III of the Constitution. Because? Columbia – Your Honor, we had to respond at trial to very – a very specific claim by Columbia that it could distribute the films because it had a valid right of first refusal. If Columbia won, it would – there was a contract in place under which we would have been paid. If Columbia lost, we would have gotten our films back. The Court didn't rule on Columbia's claim. The Court just issued a gratuitous ruling against us, the defendants, saying we couldn't distribute our films. I say that that's the clearest violation of Article III of the Constitution, and that is the clearest case where we were entitled to violate that order. The arrest warrant should go away with a ruling that that order was a violation of Article III of the Constitution. Your Honor, in – just so you – We only have about 30 seconds left on this phase of this. Your Honor, we had submitted as evidence in the case, too, the fact that we were the undisputed copyright holder of every single one of these eight films. We were the only party who could respond to Columbia's first refusal claim. The ruling gratuitously against us, Your Honor, Judge Ray was trying to preserve the stipulated judgment, trying to force a settlement from us, and I realize that. But he acted without jurisdiction, Your Honor. Thank you, Mr. Riley. Mr. Cashman, you've got about two minutes. Thank you. While Ivanova focuses on the eight pictures, it is clear that Judge Ray ruled that Ivanova was licensing 33 of the pictures. This is a factual finding of the Court, and absent a clear error, this Court should accept that finding. So this eight pictures lack of subject matter jurisdiction is really quite a red herring. Also, Judge Ray ordered Ivanova to appear so he could determine the full extent of Ivanova's compliance or noncompliance with the injunction, and this injunction prohibits Ivanova from distributing any of the 34 titles anywhere in the world. So for Ivanova to say that he's only distributing one or two titles is contrary to the district court's ruling and also cannot be tested beyond that because he has refused to appear to explain his distribution activities. As to the jurisdictional issue, I just wanted to add that the Court, even in cases where it lacks jurisdiction, has the power to award attorneys' fees. So the existence of jurisdiction is not the sine qua non for the Court taking administrative action. Also, the Court has jurisdiction to determine the extent of its own jurisdiction and, in so doing, decide what cases to decide and what cases not to decide. And the decision not to hear these appeals is well within that administrative power. Thank you. Unless there are any questions, Your Honor. Thank you, Mr. Tashkent. Mr. Riley, we're back to you on the next phase of this. The issue now is whether the district court's Rule 11 ruling was erroneous and whether the Court abused its discretion by dismissing your complaint. We're talking about the case in front of Judge Tavrezian. I think you've got ten minutes on this aspect of it. Your Honor, on February – on June 9th, Judge Tavrezian ruled that my February 13th case was a gross violation of Rule 11, sanctioned me $2,500. He assessed $39,500 in costs against me. I had to borrow $45,000 from my Pillsbury Medicine and sue for a 401K plan, and I'm going to have to pay about $8,000 in penalties and taxes. Your Honor, the primary cause of action in the complaint that I filed related to a June 8th, 1979 contract, and this is a complicated case, Your Honor. The claim was 100 percent valid, and Judge Ray had ruled that the issue had to be resolved in a second lawsuit. The new lawsuit went to Judge Tavrezian, Your Honor, and he didn't understand the lawsuit. And, frankly, he was bamboozled. Okay. Let me explain. After my client prevailed in the first Mexican lawsuit in 1996 in Mexico, he demanded to see the contracts that Columbia was using to distribute the film. The primary contract was a 1979 contract under which Columbia took 65 percent of the proceeds, paid out 35 of the proceeds to my client and his companies. Columbia argued for two years that by signing the stipulated judgment that we had acquiesced to that contract. That's the background. On March 1st, as the trial was about to start, Mr. Cashman contacted me, and this was all alleged in the complaint. And he said that under the 1979 contract, they had reassessed the situation, that even though we were entitled to 35 percent of the gross, Columbia wasn't going to pay us anymore. They had decided that they could deduct attorney's fees, that if we didn't settle with them, that we would never see another penny from the films ever again. On the same day, Columbia filed and served a lawsuit upon me. The lawsuit was for rescission of this 1979 contract that had governed the party's relationship for 20 years. I brought a motion to dismiss this lawsuit because Columbia was seeking to enforce the 1979 contract. In one action, it was seeking to rescind it. In another, it's a violation of the compulsory counterclaim rule. It was also filed way after the expiration of the stipulated judgment or, excuse me, after the expiration of the statute of limitations. Then in the 1997 case, the case went to trial. Columbia abandoned all claims related to the 1979 contract that had governed the parties for 20 years. Columbia instead put on a case that a company called Columbia Pictures Corporation Limited owned the films outright with no obligation to pay. It's a long story. Judge Ray ruled in favor of Columbia that this British corporation owned the films and what about the 1979 contract? What about the contract that had been the centerpiece of the litigation for years? Here's what Judge Ray said in his judgment. Ivanova's rights to receive motion picture participations, that was the money payable under the 1979 contract. With respect to the 26 pictures as set forth in the stipulated judgment shall be determined in the March 1st rescission case, the case that Columbia had just served on me before the trial. Fine. Then Columbia, after this judgment was issued, it did something pretty underhanded. It went and dismissed the March 1st, 2001 case. That was the case where we were supposedly going to be able to prove our right to collect the 35 percent under that old contract. I was left with no option by under those circumstances except to file a new action. Judge Ray would have, he would have looked at that and said, yeah, Columbia pulled a fast one on you. You had to file that action. Instead, the case went to Judge Tavrazian. Your Honor, and this is a complicated case. Columbia convinced Judge Ray that by my filing this new lawsuit related to the 1979 contract, that I was violating the old stipulated judgment or Judge Ray's judgment or both. I never really understood the argument, but, Your Honor, I don't even think it's worth addressing. Judge Ray had decreed in his judgment that my client's rights under the 1979 contract would be decided in the second lawsuit. Columbia then dismissed the second lawsuit. I had to file the third lawsuit. That lawsuit was actually mandated by Judge Ray's judgment. It was not in violation of his judgment, and it was not subject to race judicata effect of Judge Ray's judgment. It was required by the judgment. I also coupled that, that claim with a claim that Columbia had engaged in unlawful business activity under California Business and Professions Code 17-200 by virtue of the fact that Mr. Taskman had contacted me before Columbia decided to ignore the 1979 contract, and he said, you better make a deal with us. So, Your Honor, those two causes of action, Your Honor, just weren't in any way resolved by Judge Ray in the initial lawsuit. And the finding of race judicata or a Rule 11 violation with respect to those claims was wrong. The other main causes of action in the complaint were complaints for infringement of our Mexican copyrights. Judge Ray had made clear in his post-trial rulings after the first trial that he had ignored Mexican copyright law and that he was making no findings as to Mexican copyright ownership. And this was in an order that's at excerpt of Record 120, page 4 to 5. But Columbia and Judge DeVriesian both agreed none of my Mexican copyright infringement claims were in any way barred by race judicata, and they weren't Rule 11 violations. All of those claims remained intact. And that was the bulk of my lawsuit. That was 90 percent of my lawsuit. Those claims are still, were still alive, unaffected by the race judicata ruling. And the claims included claims that the estate was the declared, that the estate had been declared the owner of the Mexican copyrights in Mexico, that the estate had the sole right to license and distribute the films in Mexico and the other Berne Convention nations, and that Columbia had infringed upon those rights by distributing the films. That claim was intact. So, so far, Your Honor, almost all of my claim, you should rule almost all of it was intact. There was one claim that I asserted that Columbia had interfered with our contracts in Mexico. The essence of those were that Columbia used Judge Ray's common law ownership ruling, a judgment which is currently not enforceable in Mexico, to make threats upon Televisa, and that it caused Televisa to breach a contract that it had with the estate. And I think the same reasoning that Judge Tavresian and Columbia applied to the Mexican infringement claims should have applied here. Judge Ray had made clear that he had ignored Mexican copyright law and that he was making no findings as to Mexican copyright ownership. Columbia, nonetheless, used the judgment, and this was my allegation, to interfere with the estate's protected copyright activities in Mexico. I don't believe that that claim was in any way barred by the race judicata effect of Judge Ray's decision. But if the court... You've got about a minute and a half. Do you want to save any of that time, or do you want to... Pardon me? You have about a minute and a half. Do you want to save any of it, or do you want to use it up now? Your Honor, I... I want to ask a question. What is the status of the Mexican litigation over the Mexican copyright? There were three cases pending in Mexico. One of the cases has gone to judgment, and that's the state court case. The court ruled that Kantz and Floss was the owner of the films, and the question is, who succeeded to his rights, Eduardo La Parrad or my client, Mario Moreno? There's a second lawsuit in Mexico that's still pending related to the forged contract that Eduardo La Parrad is using in Mexico. It's actually Colombia now who's fronting La Parrad in Mexico, so I should say it's the forged contract that Colombia is using to try to dispossess the state of its rights in Mexico. There's a third lawsuit pending, and this is the important one. This is a lawsuit pending in the Federal Court of Mexico where the Instituto del Director de Autor has been joined as a party to the action. That's the action which seeks to invalidate, Eduardo La Parrad seeks to invalidate, our copyright registrations made in Mexico. That's the only action that will eventually have any impact upon our Mexican copyrights. But all three of those cases are currently pending. And, Your Honor, I've run out of time, and I've not addressed Judge Tavreze in throwing out our case when I missed the schedule and comments. We'll give you a minute in rebuttal. Okay. Thank you. Judge Wray's 22-page detailed findings of fact and conclusions of law are very clear, and Judge Tavrez thoroughly understood and applied Judge Wray's opinion. The two key parts of that opinion with respect to the Rule 11 motion is our Judge Wray's findings and declaration that Colombia owns all worldwide intellectual property and related rights in all 26 pictures, and that Ivanova owns no rights in any of the 34 pictures. Excuse me, Judge Tavrez. Go ahead. Does that sweeping conclusion of law or ultimate finding, I'm not sure which it is, include the participations in the movies? No, it doesn't, Your Honor. Okay. Judge Wray expressly was talking about ownership of the copyrights and other intellectual property rights, and the issue of the entitlement to royalties was unresolved. Okay. And I'll speak. To that in more than about a minute. The second key part of Judge Wray's decision is the injunction, the permanent injunction, which is identical to a preliminary injunction which was upheld by this Court, that Ivanova is prohibited from distributing, exploiting, marketing, negotiating, or benefiting in any way from any of the 33 pictures anywhere in the world. Now, based upon this, how can Ivanova file a claim for tortious interference with his rights to distribute the films when he is expressly enjoined from distributing those films? You know, what I don't understand here is Mr. Riley has not been inattentive to this case, whatever else you think about the merits of their position. He misses a Rule 16 scheduling conference because his father's taken ill on an emergency basis, and the case gets dismissed because of that. That's the part I don't get here. Well, while the dismissal because of the failure to attend the hearing was the triggering event, it really was the proverbial straw that broke the camel's back. Judge Wray had sanctioned Mr. Riley $1,000, had repeatedly admonished him. He had found ---- But had he never not appeared? No. Not for appearance, although he did miss one appearance, and this was fairly typical in other cases. But what Mr. Wray ---- Shouldn't Judge Trevesian have been confined to ruling on the particular facts that were before him in a case that was actually before him? Well, Judge Wray ---- I'm sorry, Judge Trevesian made it clear that while he found Mr. Riley's conduct before Judge Wray instructive, that it was not dispositive of his ruling, and that the conduct before him was sufficient to support the ruling. Missing the ---- No. Again, that was just really the tip of the iceberg. What Ivanova and his counsel have done is attempt to grossly tilt the playing field in their favor and deny Columbia a fair trial, and they ---- Well, it sounds like Columbia is one at every turn, so I'm ---- But a statement could be ---- Well, I mean, the fact that the playing field was tilted grossly in Ivanova's favor made that much more expensive and made that much more difficult. It seems like an ---- I don't understand the meaning of that. Certainly Columbia was represented by sophisticated attorneys and is a sophisticated company that deals routinely with copyrights, et cetera, so, you know, other intellectual property issues. So, I mean, I don't understand what you mean when you say it was an attempt to tilt the playing field. Well, I think the Rule 11 is a classic example. Judge Wray had given us rights in the pictures, and no sooner does he give us those rights than two weeks later Ivanova, ignoring those rulings, files a new lawsuit to try to deprive Columbia of those rights. Ivanova has stayed away and disobeyed Judge Wray's rulings. He has continuously refused to abide by any of the rules. He has made it clear that this is a heads-I-win, tails-you-lose litigation. And, frankly, I think Judge Trevisan was not going to suffer the same history of noncompliance that had been suffered by Judge Wray. And we had already started out. The first thing Ivanova did is file a lawsuit, 90 percent of which was barred by the prior judgment. Well, Ivanova's counsel seems to have conceded that perhaps the Mexican breach of contract, well, unfair competition claim may have been precluded. But he argues vigorously that the remainder of the claims were not precluded. The remainder of the claims relate to royalties. And those claims violated the 1993 stipulated judgment. Now, under the 1993 stipulated judgment, Ivanova had the right to bring an accounting claim. He did not do that. Instead, he said that I am entitled to all of the royalties, the full 35 percent. But the 1993 stipulated judgment says that he's only entitled to something between 11 percent and 22 percent, that other parties, Jett and Gelman, are also entitled to participations. And Ivanova's claim completely ignored the 1994 stipulated judgment and instead said, all the royalties go to me. That claim was barred by the stipulated judgment. In addition, the stipulated judgment said that until the Mexican lawsuit as to the validity of Pantinflas' inter vivos assignment to La Parada was decided, no money would be paid either to La Parada or Ivanova. It would all go to an escrow account. Now, Ivanova in the second action said, no, I want all that money, and it should be paid to me immediately. And, again, that was an express violation of the 1994 stipulated judgment. So it's quite possible that if he had filed an accounting claim as permitted under the 1994 stipulated judgment, that might have been permitted. He did not. Instead, he filed a claim that was contradicted and barred by the 1994 stipulated judgment. Mr. Cashman, I'm curious, what's the status of that escrow account established by the 1944? Is there any money in it or? Yeah. There was over $2 million in it, Your Honor. And as part of the forfeiture ordered by Judge Trevisian, the money was transferred from the escrow account into the court's registry. Into the court's registry? Yes, Your Honor. And is that where it is now? That is where it is right now. And what do you want to have come of that? Well, we want it to stay there, and we want the court to affirm or to dismiss the second case and affirm Judge Trevisian's rulings. So all that money stays in escrow and will be dealt with pursuant to the 1994 stipulated judgment? As amended by Judge Trevisian. So you don't want us to do anything with that? We want to do nothing, Your Honor, except either dismiss the appeals under the fugitive disentitlement action or affirm the appeals on the merits. If there are no other questions, thank you. Thank you. Mr. Riley, you've used up your time. We'll give you an extra minute to respond here. Your Honor, what I hear Mr. Cashman saying is that he concedes that we were entitled to bring in action for the participations that end he doesn't have. I accept that you weren't permitted to do so contrary to the 94 stipulated judgment. Well, Your Honor, what was clear is we were entitled to bring the claim. Judge Ray had made that clear. And it was Columbia's duty then as a defense to claim, no, we can pay that into the escrow account. By the way, we had offered to Columbia. We said, hey, if you pay it into the escrow, if you pay the money, Columbia claimed, hey, we're supposed to pay that money into the escrow account, not you. And we said, fine, we'll withdraw the complaint if you pay the money into the escrow. Columbia refused to pay the money into the escrow, too. Your Honor, all of these things that Columbia raises were defenses perhaps to our claim. But our claim had merit, and Judge Ray had mandated that we file this new lawsuit. We did not want to have to file this lawsuit. We thought he was going to resolve participations in the first lawsuit. And, Your Honor, if there was any problem with the way I phrased any of the causes of action, the appropriate thing to do would have been to strike. I could have refiled the complaint. But instead, Your Honor, it was thrown out as if it was a complete atrocity that I would be filing a claim claiming participations in the films after Judge Ray had ruled. And, Your Honor, the escrow account, yes, is now being held, I guess, by the Court. According to the judgment, because I missed the scheduling conference, that $2.1 million is now Columbia's property. And we obviously believe that that should be reversed, too. Your Honor, the only mistake I ever made and the only proceeding I ever missed in six painful years of this case was to miss that scheduling conference, Your Honor. And Judge Trevrizian immediately entered this onerous judgment against me, Your Honor. Your Honor, I'm not going to cite the legal principles. Now, I have a question. Is your client still a fugitive? He has yet to return to submit himself to Judge Ray's orders? Correct. Okay. So if we were to rule that his claims in this case, even though perhaps on their merits they might be, the appellate claims, some of them might be valid, if we were to rule he was not entitled to bring them because of his fugitive status, is there any support, legal support, for dismissing the appeal without prejudice subject to his returning to face the consequences of his prior sanctions? I don't know of any authority. I guess would he come here and be imprisoned while the court resolves the appeal? I don't know. I mean, I would bring it up. I assume that if he complied with the substance of the order that the judge would neither judge would still hold him in contempt. The things that he hasn't done, he distributed the four films in Mexico over DVD. He's not distributing them anymore. But we don't know that for sure because He would come to the United States and he would explain that, Your Honor. He would also, I mean, at this point, he's entitled, I believe, to retain the elements. He's the Mexican copyright holder. That order was issued as a sanction for his distributing the four films. Is he distributing solely in Mexico? Is this solely pursuant to solely in Mexico? And he never distributed any beyond those in the eight-picture group. Judge Ray, I mean, it was Columbia's burden to try to prove that with clear and convincing evidence in a contempt proceeding that we distributed the other films. And, Your Honors, Columbia suggested it to Judge Ray. We filed declarations showing that we had not distributed. And Judge Ray said, well, maybe they had distributed, but there was no finding and we have never distributed any of the other films beside those four in Mexico. Well, I'm just curious, under international law, what happens if the Mexican courts find that for some reason, such as Columbia not registering their copyrights properly in Mexico, that your client actually holds the Mexican copyright, or some combination of the parties to the stipulated judgment owns the Mexican copyright? And there's a conflict between the findings in the United States and the findings in Mexico. Where would that be resolved? Your Honor, everything that's happened here is going to be subject to a second proceeding in Mexico where Columbia tries to enforce the judgment. And in those proceedings, we will raise jurisdictional issues, we will raise the quality of the proceedings. And that's why if the court were to throw out the appeal on the grounds of the fugitive disentitlement doctrine, that would have all related to our distribution of four films in Mexico where we own the copyrights. And we would argue to the Mexican courts that we had every right to do that, that the injunction was clearly wrong by our standards of law in Mexico, and that we never got a fair shake in the United States. Your Honor, because it's an international case, I don't think there are any shortcuts to resolving this. And Your Honor, on the fugitive disentitlement doctrine, these films are distributed by the biggest companies in the world. You've exceeded your time, and we're on another subject. Now, thank you very much. We'll go on to Phase 3 of the argument. This is Authors' Rights Restoration v. Columbia Pictures. Each side will have 10 minutes. Good morning. Good morning, Your Honors. Gina Och on behalf of Authors' Rights Restoration Corporation, and I'll refer to it as ARRC. And I would like to reserve two minutes. Sure. Thank you, Your Honor. In this case, our position is that the court misinterpreted Mexican law. In fact, disregarded Mexican law in finding Columbia as the producer and as the only author of these films. Mexican law, I believe,
judges: Thompson, Silverman, Wardlaw